TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN






NO. 03-97-00074-CV






Ford Motor Company, Inc.; Leif Johnson Ford, Inc.; and Fred Capedeville, Appellants



v.



Barry Sheldon, Matthew Rueter, Margaret Dunayer, John Porter, William Dobbs, 


James Beasley, and B. J. Sanders, Individually and on Behalf of


All Others Similarly Situated, Appellees






FROM THE DISTRICT COURT OF TRAVIS COUNTY, 53RD JUDICIAL DISTRICT


NO. 93-02721, HONORABLE JOHN K. DIETZ, JUDGE PRESIDING 






 Ford Motor Company, Inc., Leif Johnson Ford, Inc., and Fred Capedeville (collectively,
"Ford") complain in this interlocutory appeal that the trial court incorrectly certified appellees' suit as a class
action. We will modify the order, and affirm it as modified.


The Trial Court Action


 Appellees purchased various Ford models on which the paint peeled: 

Appellee Car (1) Sale date First noticed peeling after sale 

Barry Sheldon 1987 Ranger January 1987 18-22 months

B.J. Sanders 1989 Ranger September 1989 9 months 

John Porter 1988 F-150 March 1988 18 months

Matthew Reuter 1989 F-150 December 1988 4 years

William Dobbs 1990 F-150 February 1990 4 years

Margaret Dunayer 1991 F-150 December 1990 17-18 months

James Beasley 1990 Bronco January 1990 4 years


Appellees claim the cars peeled because the paint process was defective, that Ford knew of the defect,
and that Ford nevertheless persisted in using the process and selling the affected cars to Texas consumers. 
Appellees seek to recover for breach of the implied warranty of merchantability and violations of the
deceptive trade practices act. The alleged DTPA violations include representing that goods have
characteristics they do not; representing that goods are of a particular standard, quality, or grade when they
are not; and failing to disclose information about goods known at the time of the transactions and intending
by that nondisclosure to induce transactions that would not have occurred but for the nondisclosure. 
Appellees contend Ford's conduct was an unconscionable action or course of action.

 The trial court certified the case as a class action on behalf of the following class of plaintiffs:


 All persons who purchased a new 1987-1993 Ford F-Series Truck, 1987-1993 Ford
Bronco, 1987-1989 Ford Bronco II, 1987-1992 Ford Ranger or 1987-1989 Ford
Mustang in Texas on or after March 8, 1988 which was painted with high build electrocoat
or medium build electrocoat and no spray primer and who suffered past and/or future
damage as a result of peeling or flaking paint on these vehicles caused by a defective paint
process (i.e., high build electrocoat or medium built electrocoat and no spray primer)
excluding persons who purchased vehicles pursuant to a fleet account or fleet identification
number; and


 All persons who purchased a new 1984-1988 Ford F-Series Truck, 1984-1988 Ford
Bronco, 1984-1988 Ford Bronco II, 1984-1988 Ford Ranger or 1984-1988 Ford
Mustang in Texas prior to March 8, 1988 which was painted with high build electrocoat
or medium build electrocoat and no spray primer and who paid Ford or a Ford dealership
for a paint repair to their vehicle to repair peeling or flaking paint caused by a defective
paint process (i.e., high build electrocoat or medium build electrocoat and no spray
primer), excluding persons who purchased vehicles pursuant to a fleet account or fleet
identification number.


Though finding issues common to the class, the court acknowledged that the multiplicity of potential causes
of peeling meant that the case likely would have a phase of individual trials following the class-wide
resolution of the common issues.


The Interlocutory Appeal


 Ford contends that the trial court erred by certifying the class action because the proposed
trial structure violates Texas's general strictures against bifurcated trials and because the suit lacks the
prerequisites for class certification. We review the trial court's decision whether to certify a class for an
abuse of discretion. RSR Corp. v. Hayes, 673 S.W.2d 928, 930 (Tex. App.--Dallas 1984, writ dism'd). 
A trial court does not abuse its discretion by basing its decisions on conflicting evidence, but does abuse
its discretion by failing to properly apply the law to undisputed facts. Forsyth v. Lake LBJ Inv. Corp.,
903 S.W.2d 146, 149 (Tex. App.--Austin 1995, writ dism'd w.o.j.); RSR, 673 S.W.2d at 930.


I. Bifurcated trial

 By points of error four and five, Ford complains that the trial court set up an impermissibly
bifurcated, piecemeal trial process. (2) Ford contends that Texas courts' traditional aversion to piecemeal
trials overcomes or modifies the class-action rule that, when appropriate, "an action may be brought or
maintained as a class action with respect to particular issues." Tex. R. Civ. P. 42(d)(1). Texas courts'
aversion to bifurcated trials predates the class-action procedural rule. Ford cites cases dating back sixty
years illustrating the principle. See Phoenix Assurance Co. of London v. Stobaugh, 94 S.W.2d 428,
430 (Tex. 1936) (insurance coverage case: whether building was total loss not severable issue from
whether plaintiff covered by policy); see also Transportation Ins. Co. v. Moriel, 879 S.W.2d 10, 30
(Tex. 1994) (exception to non-bifurcation rule: amount of punitive damages tried separately from rest of
action); Otis Elevator Co. v. Bedre, 776 S.W.2d 152, 153 (Tex. 1989) (appellate court cannot remand
negligence separately from contributory negligence and damages); Waples-Platter Co. v. Commercial
Standard Ins. Co., 294 S.W.2d 375, 377 (Tex. 1956) (appellate court cannot remand damages only;
court cannot require piecemeal trial because liability and damages are elements of indivisible cause of
action). These cases were not class actions under the rules of civil procedure, however.

 The language of Rule 42(d) indicates that it creates an exception to the general prohibition
of bifurcation. Allowing trial of separate "issues" rather than "claims"--a conscious choice, because Rule
42 refers to "claims" elsewhere--indicates that the rulemakers envisioned that something less than an entire
cause of action might be tried as a class action. Unlike former Texas Rule of Appellate Procedure
81(b)(1), Rule 42 does not require that the particular class issues be "clearly separable without unfairness
to the parties." See Otis Elevator, 776 S.W.2d at 153 (interpreting former Tex. R. App. P. 81(b)(1)). (3) 
For cases meeting its other requirements, Rule 42 requires only that the class trial of particular issues be
"appropriate." Tex. R. Civ. P. 42(d).

 Ford also argues that the term "issues" in Rule 42 should be interpreted like "issue" in
Texas Rule of Civil Procedure 174(b). Rule 174(b) provides, "The court in furtherance of convenience
or to avoid prejudice may order a separate trial of any claim, cross-claim, counterclaim, or third-party
claim, or of any separate issue or of any number of claims, cross-claims, counterclaims, third-party claims,
or issues." The supreme court held that Rule 174(b) did not allow a trial court to try damages separately
from liability in a personal injury case. Iley v. Hughes, 311 S.W.2d 648, 651 (Tex. 1958). The jury had
found liability and medical expenses, but deadlocked on general and exemplary damages; the trial court
granted a mistrial and empaneled a new jury for the damages issues only. Id. at 649. The supreme court
held that, though the text of the rule would seem to permit such, Texas's aversion to piecemeal trials
required a reading of the rule to prohibit it. Id. at 651. The court noted, however, that the rule had been
invoked to allow separate trials on issues of standing and limitations. Id. at 650. The court wrote that
Texas courts dislike piecemeal trials because the public interest, the interests of litigants, and the
administration of justice are better served by rules of trial which avoid a multiplicity of suits. Id. at 651.

 The efficiency interests the Iley court cited for unitary trials actually favor the bifurcated trial
of the common and individual issues in this case. Though individual trials may be necessary on individual
causation and damage issues, the limited class action will allow Ford to consolidate its case regarding the
paint process and knowledge about defects into one presentation in the class trial. If the factfinder fails to
find that the paint process is defective, Ford (and the court system) will have saved great amounts of time
compared to having the estimated 100,000 individual trials on all the issues in all the claims. Even if the
class jury finds the paint process was defective and Ford learned of the defect sometime during the class
period, Ford could be exonerated of knowledge of wrongdoing against class members who bought cars
before that time. Further, should Ford lose on all issues in the class action segment of the trial, it and the
public will have gained the economies of the unified trial of these common issues.

 The question remains whether this separation of liability and damages issues is appropriate
and permissible. It does not appear, however, that individual liability and damages trials will be entirely
separated. Rather, it appears that the class trial will determine whether the paint process was defective;
and, if so, when Ford knew this and if it withheld this knowledge. The individual trials could then focus on
other factors that might diminish or eliminate damage awards to individuals, such as individual contributory
causation. The trial structure jointly tries common class issues pursuant to Rule 42(d)(1), but, at the
individual trial stage, tries each individual's intertwined liability and damage issues together. We conclude
that the trial court did not abuse its discretion in allowing this arrangement. We overrule points four and
five.


II. Class-action prerequisites

 Ford contends by the remainder of its points of error that the trial court erred by certifying
the class because the appellees' suit lacks the class-action prerequisites. Rule 42 requires that (1) the class
be so numerous that joinder of all members is impracticable, (2) questions of law or fact common to the
class exist, (3) the claims or defenses of the representative parties be typical of the claims or defenses of
the class, and (4) the representative parties must fairly and adequately protect the interests of the class. 
Rule 42(a). As certified in this case, the issues common to the class must predominate over individual
issues and the class action must be the superior way to handle the suit. See Rule 42(b)(4). 


 A. Commonality

 By point of error six, Ford contends the trial court erred by holding that this suit presents
questions of law and fact common to the class. This Court has interpreted Rule 42 to require not just
common questions but common answers to those questions for all class members. Wente v. Georgia-Pacific Corp., 712 S.W.2d 253, 256-57 (Tex. App.--Austin 1986, no writ). The threshold for
commonality is not high. Jenkins v. Raymark Indus., Inc., 782 F.2d 468, 471 (5th Cir. 1986). The
commonality test is met when at least one issue's resolution would affect the claims of all or a significant
number of class members. Forbush v. J.C. Penney Co., 994 F.2d 1101, 1104 (5th Cir. 1993).

 Ford contends we should follow two cases in which the appellate courts found a lack of
commonality defeated certification. See Wente, 712 S.W.2d at 256-57; RSR, 673 S.W.2d at 933. In
Wente, this Court affirmed the trial court's refusal to certify a class of borrowers in a usury case against
a lender; this Court held the refusal was proper because the variety of types of accounts meant that different
usury rules would apply, yielding no common answer to whether the lender had treated the purported class
members usuriously. Wente, 712 S.W.2d at 256-57. In RSR, the appellate court reversed certification of
a class of persons who lived within two miles of a lead smelter; the court found no commonality because
of the wide range among purported class members in the level of lead exposure, the duration of lead
exposure, the interplay of other possible injurious causes, and the susceptibility to lead poisoning. RSR,
673 S.W.2d at 933.

 Ford contends variations in the paint process used similarly destroy the commonality even
within the limited issues certified. The trial court found that the following questions were common to the
class: (1) whether the paint process used on the cars is defective because it lacks spray primer; (2) whether
Ford knew about the defect and withheld that knowledge; (3) whether Ford had a duty to disclose the
defect; and (4) how the discovery rule applied. Ford contends that the answers to these questions are not
common among class members because the variables in the painting process--types of body materials,
kinds of electrocoat, colors, different assembly plants, models, and model years--yield numerous
combinations such that there are really thousands of painting processes within the class. (4) Ford's paint
expert testified that different metals interact with electrocoats in ways that substantially affect the likelihood
that a particular car's paint will peel. Both sides' experts agree that different electrocoats resist peeling
differently. Appellees' expert testified that solid-color cars treated with this process, when painted and
baked properly, should not peel. He also testified that cars painted with ultraviolet light absorbers are less
likely to peel than identical cars without UV-absorbers.

 Appellees' expert, however, wrote in his report that the common defect in the paint system
leading to the peeling problem was the omission of spray primer. A witness for Ford testified that any car
that had paint applied to electrocoat without intervening spray primer was a potential candidate for peeling. 
Internal Ford documents indicated that the removal of spray primer was the likely cause of the peeling of
F-150s and that use of spray primer eliminated the peeling problem. Ford even instituted a free-repaint
program that covered only cars painted without spray primer. Ford also reinstated use of spray primer at
all plants producing class cars. We cannot say that the court abused its discretion by concluding that there
was a common answer to whether the absence of spray primer made the paint process defective. The
defect inquiry (whether the cars were defective because they lacked something necessary for adequacy) (5)
is common to the class; all cars in the class have peeling paint and the jury's decision whether nonpeeling
paint is necessary for adequacy will apply to all of them. Even if other factors contribute to the peeling,
there is some evidence on which a jury might find that the lack of spray primer is the common cause. The
jury could instead conclude that other factors were key; for instance, if cars painted without spray primer
do not peel when UV-absorbers are used, then the jury might conclude the absence of UV-absorbers is
the culprit rather than the absence of spray primer. In either case, the record suggests there are questions
and answers common to the class.

 The remaining stated common issues also have common answers. The interplay of other
factors contributing to peeling does not bar the existence of a common answer to the question of
knowledge; the jury could conclude the other factors complicated the task of isolating the absence of spray
primer as the culprit and postponed the reasonable discovery date for Ford. Even if Ford's discovery date
precludes some members of the class from recovering, the answer to the discovery date question is
common to the class. If the discovery date found excludes some members of the class, it will only reduce
the number of individual causation and damage trials. The existence of other causes of peeling also has no
effect on the answer to whether Ford, once it discovered the defect, withheld or had a duty to disclose its
knowledge of the defect. 

 This case is distinct from Wente and RSR in critical respects. A significant distinction from
Wente is that the Wente court affirmed a trial court's refusal to certify a class. 712 S.W.2d at 259. The
abuse of discretion standard is such that the Wente court might have affirmed a certification as well. The
class definitions in both cases were much broader than that used here, and in neither case did the plaintiffs
attempt to isolate particular issues for class determination. In Wente, the class certified included many
types of accounts to which different usury rules applied, giving rise to a variety of answers among purported
class members that destroyed commonality. Id. at 257. The plaintiffs in this case avoided that pitfall by
specifying the flaw they believe made the paint on their cars peel. The class definition in RSR also was
much broader than the one in this case. The proposed class included all landowners within two miles of
the smelter without regard to whether lead was on their land; flaws in the definition included the failure to
account for variations in exposure, susceptibility, injury, and outside factors. 673 S.W.2d at 933. In this
case, cars that did not peel are excluded from the class, there is only one type of damage (peeling), and
variations in degree of individual injuries and outside factors are left for individual trial. The court did not
abuse its discretion by concluding that there are common questions and answers. We overrule point six.


 B. Typicality

 By points of error seven and nine, Ford contends the trial court erred by holding that the
named plaintiffs' claims are typical of the class and that the named plaintiffs are adequate representatives
of the class. The trial court's certification of the class action to particular issues limits the breadth of our
review of these requirements. The certification of a class only as to particular issues necessarily implies that
the named plaintiffs' claims are not typical for every issue in their causes of action. We will assess the
representatives' typicality and adequacy of representation on the class-certified issues.

 Within the common issues, the appellees' claims are typical of the class. The typicality
requirement is satisfied when the evidence shows that the claims or defenses of the class representative
have the same essential characteristics as those of the class as a whole; the claims need not be identical or
perfectly coextensive, just substantially similar. Cedar Crest Funeral Home, Inc. v. Lashley, 889 S.W.2d
325, 331 (Tex. App.--Dallas 1993, no writ). The appellees and the unnamed class members' cars were
all painted without spray primer and they all peeled. The named appellees allege that the lack of spray
primer caused the peeling, that Ford knew of this link, and that Ford withheld the information; the class
members must have similar claims to be in the class and recover for the alleged defect. Though Ford
complains that each named appellee and class member will likely have different additional contributing
causes for the peeling and different damages, those will be tried after the class stage and do not detract
from the appellees' typicality for class trial purposes. The diversity of individual causation and damages
issues shows that diversity itself is typical on those issues, strengthening the case for limitation of the class
certification to particular issues. We overrule point seven.

 Next we must decide whether the representatives will adequately represent the class. We
consider these factors in deciding whether the named plaintiffs adequately represent the class: 


 the adequacy of counsel, potential conflicts of interest, the personal integrity of the
plaintiffs, the representative's knowledge of the litigation and belief in the legitimacy of the
grievance, whether or not the class is unmanageable because of geographical limits and
whether the plaintiffs can afford to finance the class action. See Salvaggio v. Houston
Independent School District, 709 S.W.2d 306, 310 (Tex. App.--Houston [14th Dist.]
1986, writ dism'd). The primary issue is whether any antagonism exists between the
interests of the named plaintiffs and those of the remainder of the class. Only a conflict that
goes to the very subject matter of the litigation will defeat a party's claim of representative
status. 



Dresser Indus., Inc. v. Snell, 847 S.W.2d 367, 373 (Tex. App.--El Paso 1993, no writ). The trial court
found the adequacy of representation was not in substantial dispute. The court noted that the
representatives were knowledgeable, informed, participating, cooperative, and showed no interests
antagonistic to unnamed class members. Ford has not told us why it believes the representation will be
inadequate by these measures and nothing in the record persuades us these findings are unfounded. We
overrule point nine.


 C. Maintainability of class action

 Ford complains by two points of error that the class action is not maintainable. By point
eight, Ford complains that common issues do not predominate over individual issues. By point ten, Ford
contends that the class action is not superior to other trial methods.

 Ford contends the trial court erred by refusing to establish the trial structure and schedule
upon certification. The court certified the class understanding that thousands of individual trials might be
necessary on liability and damage issues. The results of the class trial could drastically affect the number
of claims that survive to the individual stage and could reveal viable subclasses. The court's decision to
acknowledge the need for an individual phase but to wait until that picture is clearer to make specific plans
does not constitute an abuse of discretion. We are reviewing the certification, including the predominance
and superiority requirements, understanding that there may be 100,000 class members.

 The test for predominance is not whether the common issues outnumber the individual
issues, but whether common or individual issues will be the object of most of the efforts of the litigants and
the court. Angeles/Quinoco Sec. Corp. v. Collison, 841 S.W.2d 511, 515 (Tex. App.--Houston [14th
Dist.] 1992, no writ). Differences in damage recoveries by class plaintiffs or in defenses unique to some
class plaintiffs do not destroy the class. Id. at 516. The common issues in this case overshadow all
individual issues; if the class jury finds the absence of spray primer is not a defect, or that Ford did not
know or withhold the information, the trial ends without reaching the individual issues. Even if the class jury
finds that Ford knew the paint process was defective, the finding of the date Ford acquired knowledge
could extinguish the claims of thousands of class members. "In cases where it appears that the common
issues may predominate over the individual issues, the most efficient approach for the trial court is to allow
class certification at the present time subject to a motion by the defendants after the case has developed
to dissolve the class on the grounds that the common questions are not predominant at trial." Life Ins. Co.
of Southwest v. Brister, 722 S.W.2d 764, 775 (Tex. App.--Fort Worth 1986, no writ). We conclude
the trial court did not abuse its discretion in finding at this stage that class issues predominate. We overrule
point eight.

 Ford argues that the need for individual trials destroys the normal economies, and thus the
superiority, of a class action. Ford contends 100,000 individual trials lasting one hour each would occupy
the trial court eight hours a day, 365 days a year for more than thirty-four years. Ford's formula magnifies
the importance of trying all common issues together. If the common issues instead were tried in each of
the individual trials, the individual trials would each be that much longer. If the individual trial of the
common issues added just one hour to the individual trials (and the appellate record indicates one hour is
a conservative estimate), the trial court would be dedicated daily to these trials for sixty-eight years. The
trial court's plan, while potentially lengthy, is shorter and by this measure is superior to the individual trial
of all issues. 

 The class action is also superior because it resolves all claims. As the calculations in the
previous paragraph show, individual trials of all issues save time compared to the class only if individual
litigants are dissuaded from bringing their claims as individuals. Class actions can afford individuals the
chance to seek recovery of damages for which an individual suit might otherwise be economically
unfeasible; for that reason, the class action is superior because it permits claimants to obtain a resolution
on the merits by means of an adversarial hearing despite the imbalance in the parties' economic positions. 
Ford gains the advantage of facing and possibly defeating all claimants in one action. Appellees bear the
burden of informing the whole class of plaintiffs and face the disadvantage of having only one opportunity
for successful resolution. That appellees insist, in view of these obstacles, on the certification of a class
further supports the trial court's decision. See Jenkins v. Raymark Indus., Inc., 782 F.2d 468, 474 (5th
Cir. 1986). We cannot say that the court's plan is an abuse of discretion. We overrule point ten.


 D. Structure of class definition

 Ford complains by three points of error about the structure of the class definition. By points
of error one and two, Ford complains that class members are not ascertainable without a finding on the
merits regarding the cause of the paint peeling or flaking. Ford argues that appellees therefore currently
cannot meet the numerosity requirement because the membership in the class is zero. Ford also contends
that the causation requirement impermissibly creates a fail-safe class because the class is either full of
people to whom Ford is liable or empty; Ford complains that, if the jury fails to find that the paint process
is defective, the judgment in Ford's favor will bind no one because it will bind only the empty class.

 The Supreme Court, considering a different procedural issue, interpreted Rule 42's federal
antecedent and held that the class certification procedure did not authorize a preliminary inquiry into the
merits to determine whether the suit could be maintained as a class action. Eisen v. Carlisle & Jacquelin,
417 U.S. 156, 177-78 (1974). The trial court had held a preliminary inquiry into the merits (as in an
injunctive relief proceeding) rather than a trial. The Supreme Court held that examining the merits to
determine class certification conferred the benefits of class certification on one who had not shown
entitlement. Id. at 177. The court was also concerned that the determination in a preliminary class inquiry
would occur without the traditional safeguards of trial and could prejudice the defendants at actual trial. 
Id. at 178.

 Though Eisen is procedurally distinct from this case, its reasoning is persuasive. The
concern over losing the safeguards of trial does not apply here, but the concern of granting class status to
persons who have not demonstrated entitlement to the class action resonates even more strongly here
where full trial (rather than a preliminary hearing) of some issues would be held before class membership
could be ascertained. See also Armstrong v. Chicago Park Dist., 117 F.R.D. 623 (N.D. Ill. 1987);
Hagen v. City of Winnemucca, 108 F.R.D. 61 (D. Nev. 1985). The Armstrong and Hagen trial courts
both rejected attempts to define classes of persons discriminated against by city actions or regulations. 
Armstrong, 117 F.R.D. at 626-27 (proposed class of persons denied promotion by discrimination self-defeating because of "prohibition" on inquiring into merits at certification stage); Hagen, 108 F.R.D. at 63
(proposed class of persons denied constitutional rights by prostitution policy wrongfully requires merits
determination for certification). The Hagen trial court reformed the proposed class definition to include
all persons permitted to work as prostitutes. Id. at 64.

 We conclude that the class definitions in the trial court's order violate Rule 42 by allowing
the named plaintiffs to proceed in a class action before showing that a class exists. Though seeking to limit
the class was a valid goal, certifying a memberless class was an abuse of discretion.

 We need not reverse the certification entirely, however. We address Ford's objection to
the liability clause in the definitions by inserting the phrase "who allege the peeling or flaking was" before
the merits-determination clause "caused by a defective paint process." The class of people who purchased
the specified peeling cars and who allege that the lack of spray primer caused the peeling or flaking is
ascertainable without a decision on the merits. Notice can be sent to all persons who purchased the listed
cars. Whether the paint on a particular car peeled is susceptible of objective proof and within the buyer's
knowledge. Those persons can choose whether to opt out of the class. Whether the buyer makes the
allegation is not an inquiry into a state of mind, but objectively verifiable and within the buyer's knowledge. 
This class is not empty--Ford estimated some 100,000 individuals in its brief; whatever the minimum
number required, 100,000 clearly meets the numerosity requirement. We therefore sustain in part and
overrule in part points of error one and two. Because the membership of this reformed class is not
dependent on a merits determination, the reformed class is not a fail-safe class, and we overrule point three
as moot.


CONCLUSION


 We modify the class certification order and revise the class definitions in accordance with
our opinion as follows:


 All persons who purchased a new 1987-1993 Ford F-Series Truck, 1987-1993 Ford
Bronco, 1987-1989 Ford Bronco II, 1987-1992 Ford Ranger or 1987-1989 Ford
Mustang in Texas on or after March 8, 1988 which was painted with high build electrocoat
or medium build electrocoat and no spray primer and who suffered past and/or future
damage as a result of peeling or flaking paint on these vehicles who allege the peeling or
flaking was caused by a defective paint process (i.e., high build electrocoat or medium
built electrocoat and no spray primer) excluding persons who purchased vehicles pursuant
to a fleet account or fleet identification number; and


 All persons who purchased a new 1984-1988 Ford F-Series Truck, 1984-1988 Ford
Bronco, 1984-1988 Ford Bronco II, 1984-1988 Ford Ranger or 1984-1988 Ford
Mustang in Texas prior to March 8, 1988 which was painted with high build electrocoat
or medium build electrocoat and no spray primer and who paid Ford or a Ford dealership
for a paint repair to their vehicle to repair peeling or flaking paint who allege the peeling
or flaking was caused by a defective paint process (i.e., high build electrocoat or medium
build electrocoat and no spray primer), excluding persons who purchased vehicles
pursuant to a fleet account or fleet identification number.



(Emphasis added in accordance with this opinion.) These modifications do not substantially alter the class
membership; rather, they serve to make class membership ascertainable at the outset of the suit. Because
the class membership is essentially that on which the trial court made its findings and conclusions, we need
not remand the case for new findings or reexamine the existing findings. These modifications do not limit
the trial court's ability and responsibility under Rule 42(c)(1) to alter, amend, or withdraw the class
certification order as the case progresses.

 With the stated modifications, we affirm the certification order.



 

 Marilyn Aboussie, Justice

Before Chief Justice Carroll, Justices Aboussie and B. A. Smith; Chief Justice Carroll not 

 participating

Modified and, as Modified, Affirmed

Filed: March 12, 1998

Publish

1. The class definition includes both cars and trucks. Though truck owners might object, we will use
the term "cars" rather than the more cumbersome "vehicles" to include all trucks and cars described by the
class definition.
2. We note that the certification order itself does not mention bifurcating the trial between a class phase
and an individual phase. The court's finding of common issues only through part of the causation element,
however, indicates its recognition that there will need to be individual findings on causation and damages. 
Both parties argue that bifurcation, to some degree, will be necessary. Because Rule 42 allows for both
subsequent modification (subsection (c)(1)) and class trial of only particular issues (subsection (d)(1)), we
will review the order with the bifurcation in mind. We will conduct our examination assuming that all issues
not designated as common questions will be tried individually.
3. The new rule of appellate procedure keeps most of this language, deleting only "clearly." See Tex.
R. App. P. 44.1 (b).
4. Ford lists four body materials, three electrocoats, eight plants, five models, ten model years and
several dozen colors. This yields six hundred possible combinations for each of the "several dozen" colors. 
Ford, however, does not show that all these possible combinations were used.
5. This definition of defect comes from Plas-Tex, Inc. v. United States Steel Corp., 772 S.W.2d 442,
444 (Tex. 1989).


fy the class certification order and revise the class definitions in accordance with
our opinion as follows:


 All persons who purchased a new 1987-1993 Ford F-Series Truck, 1987-1993 Ford
Bronco, 1987-1989 Ford Bronco II, 1987-1992 Ford Ranger or 1987-1989 Ford
Mustang in Texas on or after March 8, 1988 which was painted with high build electrocoat
or medium build electrocoat and no spray primer and who suffered past and/or future
damage as a result of peeling or flaking paint on these vehicles who allege the peeling or
flaking was caused by a defective paint process (i.e., high build electrocoat or medium
built electrocoat and no spray primer) excluding persons who purchased vehicles pursuant
to a fleet account or fleet identification number; and


 All persons who purchased a new 1984-1988 Ford F-Series Truck, 1984-1988 Ford
Bronco, 1984-1988 Ford Bronco II, 1984-1988 Ford Ranger or 1984-1988 Ford
Mustang in Texas prior to March 8, 1988 which was painted with high build electrocoat
or medium build electrocoat and no spray primer and who paid Ford or a Ford dealership
for a paint repair to their vehicle to repair peeling or flaking paint who allege the peeling
or flaking was caused by a defective paint process (i.e., high build electrocoat or medium
build electrocoat and no spray primer), excluding persons who purchased vehicles
pursuant to a fleet account or fleet identification number.



(Emphasis added in accordance with this opinion.) These modifications do not substantially alter the class
membership; rather, they serve to make class membership ascertainable at the outset of the suit. Because
the class membership is essentially that on which the trial court made its findings and conclusions, we need
not remand the case for new findings or reexamine the existing findings. These modifications do not limit
the trial court's ability and responsibility under Rule 42(c)(1) to alter, amend, or withdraw the class
certification order as the case progresses.

 With the stated modifications, we affirm the certification order.



 

 Marilyn Aboussie, Justice

Before Chief Justice Carroll, Justices Aboussie and B. A. Smith; Chief Justice Carroll not 

 participating

Modified and, as Modified, Affirmed

Filed: March 12, 1998

Publish

1. The class definition includes both cars and trucks. Though truck owners might object, we will use
the term "cars" rather than the more cumbersome "vehicles" to include all trucks and cars described by the
class definition.
2. We note that the certification order itself does not mention bifurcating the trial between a class phase
and an individual phase. The court's finding of common issues only through part of the causation element,
however, indicates its recognition that there will need to be individual findings on causati